IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW-JERSEY,

AT JULY TERM, 1850.

---

## GOUGH v. BELL.

1. At common law, the right of the owner of lands along the shore of the sea, or of navigable waters in which the tide ebbs and flows, extends only *to* the shore or ordinary high water mark; the shore, which is the land between ordinary high water mark and ordinary low water mark, and the lands under water, belong to the state, and are part of the sovereignty.

2. But in New Jersey (a) the owner of lands along the shore of tide waters may extend his improvements by wharves or filling up, *over* the shore in front of his lands to low water mark, unless prevented by the state, provided he do it so as not to interfere injuriously with navigation; and when he has so improved or reclaimed the shore, his title will extend to *actual* high water mark; and the state cannot grant the shore so recovered, nor appropriate it to public use without adequate compensation.

3. Whether the owner of lands on tide water has such *right* to the use of the water, that the state cannot authorize any improvements in front of his lands, which will destroy or abridge that right without compensation, *quere?*

---

In trespass *quare clausum fregit.*

The declaration of the plaintiff described the close, situate in the township of Van Vorst, in the county of Hudson, as "a close abutting on the north, lands of John B. Coles, Isaac

(a) This matter is now regulated by statute, passed March 18, 1851. See *Pamph. Laws* 335.

U. Coles, and William F. Coles (the devisees of John B. Coles, deceased) ; on the east by the Hudson river and other lands of the said devisees ; on the south by the road, street, or avenue, commonly called Pavonia avenue, and by the dock or wharf, commonly called Coles' dock ; and on the west by the street or road, commonly called Provost street." The defendant pleaded *liberum tenementum.* There were two pleas, but they were substantially the same, and issue was joined upon the usual replication.

The action was brought in 1843. Upon the first trial of the cause at the Hudson Circuit, December, 1844, a verdict was rendered for the plaintiff; but it was set aside on the ground of misdirection, the judge having overruled the whole evidence offered by the defendant of title, and directed the jury to find for the plaintiff. (1 *Zabr.* 157.)

The case again went down for trial, and came on to be heard before the Chief Justice, in the Hudson Circuit, November term, 1848, when the following title was set up by the defendant :

1. A survey, by the proprietors of East Jersey to Elisha Boudinot, dated May 21, 1802, for 53½ acres of land (then lying below high water mark) along the beach on west side of Hudson's river, and running into the same between Paulus Hook and Hoboken, and adjoining land (then) of Robert Kennedy, in the township and county of Bergen, of which the *locus in quo* was proved to be part, since filled in.

2. A deed from Elisha Boudinot to Nathaniel Budd, the father of the defendant, dated January 2, 1804, conveying in fee the same 53½ acres of land.

3. A deed for the same 53½ acres, from Nathaniel Budd *et ux.* to Willis Hall, dated October 1, 1835 ; consideration set out in the deed $25,000.

4. A mortgage deed from Willis Hall to Nathaniel Budd, dated October 1, 1835, to secure the sum of $21,000 on the same 53½ acres.

5. A deed from Willis Hall to the New Jersey Harbor Company, dated May 31, 1837 ; " received the same day for the 53½ acres of land the sum of $120,733.33."

6. A certified copy of the act of incorporation of New Jersey Harbor Company, passed March 13, 1837.

7. Proceedings in Chancery, wherein Joseph Budd, administrator of N. Budd, deceased, and Benson Milledoler were complainants, and the New Jersey Harbor Company defendants, and decree of foreclosure, dated October 18, 1840, and execution issued for sale of mortgaged premises, dated January 7, 1841.

8. A deed for said mortgaged premises, from Henry Newkirk, sheriff of Hudson, to Mary Bell, dated August 7, 1841, for the consideration of $6771.

9. Act of the legislature of New Jersey, passed November 8, 1836, vesting the right and title of the state of New Jersey to the said 53½ acres described in the deed from Boudinot to Budd. [Objected to by the plaintiff, as incompetent evidence.]

10. Act of the legislature of New Jersey, passed November 22, 1802, to authorize the laying out of a road to Budd's dock, and to authorize Budd to erect a ferry from the said dock to the city of New York. (The dock and ground intended to be used for the purpose of the ferry were held by said Budd, as tenant under the Kennedy title, since vested in the plaintiff).

11. Original map, indicating boundaries of the township of Bergen, location of patents and grants, and general partition of the common lands, made by Charles Clinton and others, commissioners appointed by the legislature, by act of December 7, 1763, to divide the common lands of Bergen; filed in Clerk's office of Bergen county, March 2, 1765. Also field book and report of commissioners; description of lot No. 6, on map, (see p. 5); designation of lot No. 5, on map, (see p. 7, &c.)

In support of his title, the plaintiff offered, and read in evidence—

1st. Copy of patent of charter granted to the town and freeholders of Bergen, by Governor Philip Carteret and council, under Carteret and Berkely, the lords proprietors, dated September 22, 1668. The grant begins at the north, at a place "on the west side of Hudson's river," called Mordanis' meadow; thence, into the interior westwardly, till it comes to Hackensack river; thence, along that river, till it comes to a

point opposite Staten Island, in Arthur Cull bay; thence to run eastward along the river called Kill Van Cull, that parts Staten Island and the main, to a point or neck of land called Constable's point, &c.; and from thence to run up, northward, all along the bay up *into* Hudson's river, till it comes to Mordanis' meadow aforesaid; and the grant describes the whole tract as bounded *on the east by Hudson's river*, &c.; "the whole, both upland and meadows and waist land" containing, according to the survey, 11,520 acres, English measure; which said limits and bounds,·together with all rivers, ponds, creeks, islands, inlets, bays, fishing, hawking, hunting, and all other appurtenances whatsoever, &c., the half part of the gold and silver mines, and the royaltie of lords proprietors only excepted: the said corporation submitting themselves to the lords proprietors and the government of the province.

2. Deed of the trustees of Bergen to John B. Coles, dated February 4, 1804.

3. Deed of John Kennedy and Robert Kennedy (by their attorney, Robert Watts,) to John B. Coles, dated February 4, 1804, with the powers of attorney to Watts.

4. Last will and testament of John B. Coles, dated January 11, 1826.

5. A certified copy of an act of the legislature of New Jersey, passed December 7, 1763, appointing commissioners to divide the common lands of the town of Bergen.

6. Commission to London to examine Robert Lemon, clerk in the state paper office, and return to prove examined copy of the colonial act.

The plaintiff further proved that the *locus in quo* was, in 1804, part of the shore or land between low and high water mark in front of, and adjoining his land upon the Hudson river, and that it had been reclaimed or filled in by him, or those under whom he holds, prior to 1836, the date of the act of the legislature granting the 53½ acre tract to Nathaniel Budd, under whom the defendant claims; and that the trespass complained of was committed wholly *within* this reclaimed shore.

On the close of the evidence, the counsel of the respective parties agreed that a case should be made, to embody the tes-

timony, for the decision of the court at bar, and the jury was thereupon discharged. Leave was reserved to either party, if dissatisfied, to turn the case into a special verdict.

The cause was argued before the CHIEF JUSTICE and Justices CARPENTER and RANDOLPH, by *A. Whitehead* and *Dayton*, for the plaintiff, and by *B. Williamson* and *Vroom*, for defendant.

*Whitehead* and *Dayton*, for plaintiff.

The paper title of the plaintiff includes the shore of the river. The plaintiff shows a title under J. B. Coles, in whom vested both the Kennedy title and the claim of the trustees of Bergen. The title through the trustees commences with a grant from Governor Carteret and council, 22 September, 1668, for 11,520 acres; and 16 December, 1672, the proprietors of East Jersey confirmed all grants prior to 28 July, 1672. (See *Leaming & Spicer* 35).

January 14, 1713–14, Governor Hunter and council granted a patent to the freeholders of Bergen, incorporating them by the name of "the trustees of the freeholders, inhabitants of the township of Bergen," recognising the grant of Governor Carteret, and authorizing them to make by-laws for the improvement and preservation of their common lands, and to sell and to dispose of them at discretion. It cannot be controverted but that Governor Carteret and council had the right to grant the bed of the river and other royalties, because they represented the proprietors, in whom the right of government, as well as the ownership of the soil, was then vested. See *Leaming & Spicer* 19, § 7; *Ib.* 33, § 3; *Ib.* 34, § 4, *et passim*. The terms of the charter, which was of a municipal corporation, as well as a grant of land, cannot be satisfied but by including a portion of the river in its boundaries. Its terms are "up along the bay *into* Hudson's river, till it comes to Mordanis' meadow aforesaid," &c.

The trustees of Bergen conveyed their right to the premises, being part of the tract known as the West India farm, to John B. Coles, February 4, 1804. On the same day he acquired the conflicting title, by deed, from John and Robert Kennedy

they being previously in possession. The deed of the trustees, in the description of the boundaries, runs "*into*" the river. The sense of those interested under the Bergen grants may be seen by the report of the commissioners. In the description and location of two small patents, lying adjoining this shore, it is added by the commissioners—"together with all land lying in front down to low water mark." (See *Field book, p.* 68, &c.)

There has been always an adverse possession of the shore by Coles, and those under whom he claimed, which, if not conclusive, must add great weight to the question of construction, as well as to the reasons to be urged, that a local rule here exists, which carries title to low water mark. It is admitted that Coles was the owner of the upland bounded by the river: he and those under whom he claimed have been there, at least, since 1790. An act of the legislature, passed in 1802, authorized Budd, who then held under the Kennedy title, to lay out a road from the Newark road to Budd's dock, and to establish a ferry on the land now held by the plaintiff. Budd built this dock under the Kennedy title, at any rate extended it. The position of the dock will be seen on Mangin's map. Jarvis, who held under the same title subsequently vested in Coles, built a dock, and filled up that shore below high water mark; and these erections, which are recognised in the act referred to as existing, were built without any special grant for that purpose. This erection or filling in was at a cost $3500, and went 700 or 800 feet into the river, within the bounds of the survey to Boudinot.

In 1814 or 1815, Coles, who then owned the entire tract, commenced " Long Dock," a wharf which extends 1300 feet into the cove, and was completed in 1818. This dock is 80 feet in width, and, at its end, has an addition forming an L, which is 200 feet in length, extending from the end of the wharf up the river, and actually enclosing the part of the premises since filled in by Coles, upon which the alleged trespass was committed. This dock was used for all purposes by its owners until 1836, when it became necessary to repair it. It was then rebuilt, at a heavy expense, with stone walls. Be-

sides the dock, Mr. Coles filled in a large amount of the shore immediately north of this dock, at a cost of $12,000 ; the expense of rebuilding the dock and filling in the shore, in all, amounting to more than $28,000. All this was substantially completed before the passage of the act of November 8, 1836, by which, it is alleged, all these valuable improvements, with the title to the shore, were divested out of Coles, and granted to Budd. The legislature was imposed upon. The glaring injustice of this case, however, is a pregnant proof of the impolicy of the rule contended for by the defendant. When the act passed, the owner had reclaimed five or six acres of the shore, at a great expense, besides " Long Dock," over and above the expenditures by Jarvis, &c., under his title ; and yet all this was conveyed, if the grant is valid.

The maxim *nullum tempus occurrit regi* does not apply to the grantee of the state.    *Angell Lim.* 37, § 5 ;  *Runn. Eject.* 59.

It is perfectly obvious that the defendant has no title under the survey of Boudinot ; if any, it rests entirely upon the act of November 8, 1836.    *Arnold* v. *Mundy*, 1 *Halst.* 1 ; *Martin* v. *Waddell*, 16 *Pet.* 367.   He came under that act, as any other individual might have come, asking of the legislature a grant in derogation of the rights of the riparian owner. He asked and obtained the grant upon a false suggestion, that the flats were in front of his wharf: the misrepresentation appears on the face of the act, and the law is void.  2 *B. C.* 348 ; *Freeman* 172 ;  *Comming* v. *Forrester*, 2 *Jac. & W.* 342 ; *Needler* v. *Winchester*, *Hob.* 229 ; 2 *Har. Dig.* 3152, *tit.* "*Grant ;*" *Com. Dig.* "*Grant*" (*G.* 8, 9) ; 17 *Vin.* 100, 104, &c. ; 5 *Wheeler* 293 ; 9 *Pet.* 668.

Even if the act were not void, construed in connection with the title and preamble, the act would convey only ground covered with water at the time when passed.

But can the legislature, in this state, make a grant to private use in front of the riparian owner, and shut him out from the water ?  He has rights arising out of his position, of which he is not to be deprived, even for public purposes, without just compensation.   It is legislation against reason and common

right to appropriate the property of one man to the use of another.

The public have a right to the shore, the space between high and low water mark, for public purposes only. It has been said in England to be held by the sovereign, who there represents the state, for the use of the public. It may be doubtful how far the doctrine is applicable here, but was it ever before supposed that the shore could be granted by the state, in derogation of the rights of the riparian owner? Can the state grant reclaimed land? It is remarkable how little is to be found on the subject beyond general principles of the common law inapplicable to the state of things in this country. Certainly courts will not here apply those principles so as to be subversive of established rights, and in a way that is obviously unjust. Much was said in regard to the title of the shore on a previous occasion, and the *dicta* went farther than the case required, but the principal question is still open for decision.

But supposing the common law to be as contended for, it has been much modified in this country. There is in this, as in other states of this country, a local common law, which ought to be regarded. The riparian owner here has always been understood to have the right to the use of the water, and the right of making docks, wharves, &c., as the necessities of commerce and business may require, to an extent not inconsistent with the public rights of navigation, &c. The exclusive right of fishing on the shore belongs to the riparian owner; originating in the well established usage of the state, it has long since been recognised by law. A vast amount of improvement on our navigable waters rests upon the same title which it is here sought to impeach in the hands of the plaintiff. Not an act of the legislature can be found to sanction a vast many of these improvements, and yet when they interfere with no public right, who ever before doubted the title of those by whom made? Wharves, landings, meadows, enclosed below high water mark. The usage in this state has been universal. What is such an exercise of right, on the part of the riparian owner, but an indication of our common law? This usage, as in Rhode Island, may have grown out of some old ordinance

or grant, perhaps, yet to be found in the paper office in London or elsewhere, but .it has existed from the origin of the province.

The use of the shore by the plaintiff, and those under whom he holds, is sufficient to warrant the presumption of a grant. In 1802, dock erected by Budd under the same title. So in 1806, dock erected and land filled in by Jarvis. In 1814, 1815, 1836, &c., dock erected and improvements made by Coles.

The doctrine contended for by the plaintiff has become the common law of this country, and no case can be found to justify cutting off the riparian owner from the contiguous water. *Bowman's devisees* v. *Waltham*, 2 *McLean's C. C. R.* 376 ; *Harrison* v. *Sterrett*, 4 *H. & McHen.* 540 ; *Angell on Tide Waters* 171, 175, 182, 196, &c., (*ed.* 1847). See cases in Maine, Massachusetts, Connecticut, Rhode Island, Pennsylvania, South Carolina, Ohio, Maryland, &c., there cited, in all which the shore owner goes to low water mark. So it would seem in New York. In some states, it is true, this may have grown out of old ordinances, but, upon the whole, it seems to have become our common law in this country.

In case of encroachment, the remedy of the government is by information for purpresture or by indictment. The state may seize in such legal mode for the purpose of maintaining the public rights, as of navigation, but it cannot delegate such powers to its alienee.

It is said that the alienee of the state may hold, subject to the public use, the right of passing and repassing ; but this is an English notion, which grew out of their peculiar prerogative doctrines, and is here inapplicable.

The counsel of the plaintiff also cited *Blundell* v. *Catterall*, 5 *B. & Ald.* 268 ; *Duke of Somerset* v. *Fogwell*, 5 *B. & C.* 875 ; 3 *Kent* 425, 427, &c., (*5th ed.*) ; *Handly's lessee* v. *Anthony*, 5 *Wheat.* 374 ; *Storer* v. *Freeman*, 6 *Mass.* 435, 438 ; *Marcy* v. *Darling*, 8 *Pick.* 283 ; *East Haven* v. *Hemmingway*, 7 *Conn.* 186, 202 ; *Chapman* v. *Kimball*, 9 *Ib.* 38 ; *Rex* v. *Pegham*, 8 *B. & C.* 355.

The defendant claims title to the whole premises described

in the plaintiff's declaration ; to a part she has no pretence of title, and therefore judgment should be given for the plaintiff.

*Williamson* and *Vroom*, for defendant

The plaintiff shows no title by grant to the land in dispute under the terms of his grant; his rights are simply those of a riparian owner. His title comes under Kennedy by deed, February 4, 1804, but that deed does not contain the words relied on, " into " Hudson's river, &c. ; but he sets up a deed from the trustees of Bergen to John B. Coles. This is but a quit-claim deed, referring to the Kennedy title, bearing the same date with the Kennedy deed, and releasing the right or claim of the trustees to the premises. It did not intend to convey any land covered by water, and it is doubtful if such land could be conveyed by the general words used.

But the grant under the charter of incorporation (September 28, 1668,) contains no grant of the bed of the river, and the trustees had no rights in the river to convey. The commissioners appointed by the legislature, in 1763, to divide the common land of Bergen, in their report say, they find no patent for the Kennedy property, known as the " West India farm," and which they describe as " binding on Hudson's river," though lying at the bottom of the cove. (*See Field book.*) As to the construction of these deeds, and that the grants extend to the water only, see argument of Mr. Bayard, *Pea Patch case*, 131, and cases cited ; *Corfield* v. *Coryell*, 4 *Wash. C. C. R.* 384 ; Mr. Wood's argument in *Martin* v. *Waddell*, 16 *Pet.* 381, &c. ; cases cited by Justice Randolph, 1 *Zab.* 162. The expressions in the charter to the trustees, granting all rivers, fisheries, and other royalties, must be confined to those within the boundaries of the grant. 4 *Wash. C. C. R.* 384.

The defendant claims—first, under the proprietors of East Jersey, her title being derived from Elisha Boudinot, to whom a survey of 53½ acres, covering the *locus in quo*, was made May 21, 1803. When the survey was made, it was upon land covered by water, a portion of which, including the *locus in*

*quo,* has been since raised, by labor, above water. We say the soil so raised enures to the benefit of the proprietors.

But, secondly, we claim under grant from the state, by act November 8, 1836, (*Pamph. Laws* 13). At the date of this act, the title was in Willis Hall, by virtue of a deed from N. Budd, and any benefit to Budd enures to his grantee holding by warranty. 1 *Paige* 473; *Carver* v. *Jackson,* 4 *Pet.* 85; *Jackson* v. *Stevens,* 13 *John.* 315; 1 *Zab.* 164.

It is alleged that the grant is void, because of fraud. But the plaintiff is a total stranger, and cannot set up this to impeach the grant.

Fraud must be proved, and cannot be presumed.

There is no fraud apparent upon the face of the preamble; no false suggestions appear. But can this be set up in a court of law at all? In the case supposed the king's grants are said to be *relieved against,* which is a technical expression, and looks to another forum.

Did the act of 1836 pass the title of the *locus in quo,* and, if so, was it subject to any claim by the riparian owner for raising land at his pleasure, and converting it to his own use? The question is not, whether we can raise the land, or how we can use it, but it is, whether, against the state or the grantee of the state, the plaintiff can convert it to his own use, and, by filling up, extinguish both public and private rights.

In New Jersey, the title to land under navigable waters is in the state. By common law, the title of the riparian owner extends only to high water, unless claimed by grant from the sovereign power or by prescription, which supposes a grant. In England, the shore is in the king and his assigns, the very right of property in the soil itself (*Angell on Tide Waters* 20) it is said, as the representative of the public. It does not alter this case; he can convey the right of soil to an individual. The right was never questioned, either before or since *magna charta,* though his power, since *magna charta,* to grant the right of exclusive fishery has been questioned. The soil, says Best, Justice, in *Blundell* v. *Cotterall,* can only be transferred subject to the public trust. *Angell* 23, 27, 40, &c., and cases. It was so far admitted in *Martin* v. *Waddell.*

The king, then, or the sovereign power, has the right to convey the soil under tide waters, subject to public rights. It must be something beneficial. May the grantee, then, not set up the grant against all the world, except those in the exercise of the public rights, to which the grant is subject? All piers, &c., are held at the pleasure of the state, and besides indictment may be claimed by the state in a legal way.

But when has it been questioned that parliament can convey these common rights at will? What the king held was as trustee for the people, but the acts of parliament are the acts of the people themselves. The people by their representatives, may convey a public right, unless the act be repugnant to some constitutional and supreme law. We interfere here with no rights not common to all citizens. *Bennett* v. *Boggs, Baldw.* 75; Taney, C. J., in *Martin* v. *Waddell.*

The act interferes with no rights of the riparian owner, it but conveys the rights of the state. We have not interfered with the rights of the riparian owner: when we shall attempt to raise the soil, it will be time enough to decide as to the extent of the grant. We stand in the place of the state as to right of soil. The owner of the shore has no right to disturb the rights of the state.

If a gold mine were below high water mark, it would not belong to the owner of the shore, and yet it has been covered up by him against right and without the permission of the state. [C. J. Mr. Coles owned marsh covered by the tide in the rear of this grant. How far does the right of the state extend, and could this be granted?] The legislature gave right to dock out at Jersey City; the land necessarily followed the right, and became private property.

Again, the riparian owner has no right to wharf out, so as to acquire title against the state, without its consent. There is a difference between the mere permissive privilege to dock and the right to dock. Individuals cannot interfere, except as it becomes a nuisance, but the state may. If a wharf interferes with the navigation, no doubt but an indictment will lie, but without indictment the state may interfere by direct action, because of title to the soil. An erection below high water

mark is a purpresture, which the king may seize or destroy at will. *Angell* 198, 199, 200. The rights of the state are of property and of conservation. The state may interfere by information of intrusion or by information at the suit of the attorney general in equity. *Eden on Injunc.* 260; *Angell* 200; *Comw.* v. *Wright* cited *Angell* 206. But the right of property may be indicated by direct action, either in her own hands or in those of her grantee.

This alienation by the state is valid, unless the plaintiff has a right under some well established usage, which has ripened into law. If such usage exists, it must be shown by the plaintiff. It must be proved by judicial decision, legislative recognition, or the continued exercise of right. But even such exercise is here of no avail, because it is consistent with the privilege at common law. It has received no sanction, but legislative action and judicial decision have been to the contrary. See *oyster laws of* 1824–5, (*Pamph.* 58); *Corfield* v. *Coryell*, 4 *Wash. C. C. R.* 386; *Angell* 63; *Ib.* 249, *et seq.; Report of commissioners on the extent and value of lands under water in Hudson, January* 25, 1849.

GREEN, C. J. To an action of trespass for breaking and entering the plaintiff's close, and cutting and carring away the grass there growing, the defendant pleaded *liberum tenementum,* upon which plea issue was joined.

Upon this issue, it became incumbent upon the defendant to establish her title to the *locus in quo.* It was not necessary, however, that she should prove title to the whole close described in the declaration. The plea of *liberum tenementum* is construed to mean, not that the whole close described in the declaration is the soil and freehold of the defendant, but merely that part of the close in which the alleged trespass was committed. And the rule is the same, whether the close is described in the declaration by name or by metes and bounds; and the record of a judgment upon such issue, in favor of the defendant, will be evidence, not that the whole close, but that part of it only where the trespass was committed, is his freehold.

This construction, it must be admitted, is not in conformity to the language of the plea, nor to the general rule, which requires the allegation and proof to correspond. But it is entirely consistent with the design of the plea, which is to test the title to the particular place where the alleged trespass was committed. *Smith* v. *Royston*, 8 *Mees & W.* 381 ; *Richards* v. *Peake*, 2 *Barn. & C.* 918 ; *Tapley* v. *Wainwright*, 5 *Barn. & Ad.* 395 ; *Bassett* v. *Mitchell*, 2 *Barn. & Ad.* 99 ; 1 *Archb. N. P.* 331 ; *Phillips* v. *Phillips*, 1 *Zab.* 42.

The inquiry, then, upon the issue in this cause is, not whether the defendant has shown title to the entire close described in the declaration, which she obviously has not done, but whether she has shown title to the particular place where the trespass is shown to have been committed.

I. In support of her claim of title, the defendant relies—*first*, upon a survey of 53½ acres, strict measure, made by the proprietors of East Jersey to Elisha Boudinot, on the 21st of May, 1803, and title thence deduced through a chain of mesne conveyances to herself.

In the survey, the tract is described as " all that tract of unappropriated land situate along the beach on the west side of Hudson river, and running into the same between Powles Hook and Hoboken, and adjoining land of Robert. Kennedy." Upon the evidence, it appears that the entire survey, at the time of the location, was below ordinary high water mark in a cove or bay, commonly called Harsimus bay, opening into the Hudson river between Jersey City and Hoboken. The *locus in quo*, at the time of the location of the survey, was between ordinary high and low water mark ; but at the time of the alleged trespass it had been filled up, and raised above the flow of the tide, by the owners of the land adjoining the shore, and was occupied by the plaintiff as meadow or grass land.

This evidence shows no title in the defendant. The right of property in the soil covered by tide waters, in all navigable rivers and arms of the sea within the limits of the state of New Jersey is vested in the state. At the date of the survey to Boudinot there was no title in the grantors, to the premises therein described, which could pass by the grant. This can

no longer be treated as an open question. It has been decided, upon the most learned and elaborate arguments, and after mature consideration, both by the Supreme Court of this state and by the Supreme Court of the United States. *Arnold* v. *Mundy*, 1 *Halst.* 1; *Martin* v. *Waddell*, 16 *Peters* 367.

II. The defendant further, in support of her claim of title, relies upon a title derived from the state of New Jersey, under and by virtue of an act of the legislature, passed on the 8th of November, 1836. *Pamph. Laws* 13.

In deciding the effect of this act upon the rights of the parties, it will be necessary to consider—

1. The extent of the title of the state to the soil of navigable rivers, and its limits.

2. The power of the legislature to convey that title.

3. Whether, in fact, title to the premises in dispute passed to Nathaniel Budd under the act of 1836.

1. The ancient rule of the common law is, that the title of owners of land bounded by the sea, or by navigable rivers where the tide ebbs and flows, extends to ordinary high water mark only. The title to the *shore* between ordinary high and low water mark, as well as the title to the soil under the water, belongs, *prima facie*, to the sovereign. *Hale de Jure Maris*, part 1, cap. 4; *case of the River Banne, Davies* 152; *Woolrich on Waters* 20; 3 *Kent Com.* (2d ed.) 427, 431; *Arnold* v. *Mundy*, 1 *Halst.* 67; *Martin* v. *Waddell*, 16 *Peters*, 367; *Pollard's lessee* v *Hagan*, 3 *Howard* 212.

This title, which by the common law of England is vested in the king, upon the revolution, became vested in the people of the state. With this modification, growing out of the form of government, the rule of the common law prevails here, except so far as it has been modified by statute or by local common law. In this state, the rule of the common law, as to the limits of the right, remains unaltered. High water mark constitutes the boundary between the proprietary and the sovereign titles. This point is fully settled by the cases already cited. *Arnold* v. *Mundy*, 1 *Halst.* 1; *Martin* v. *Waddell*, 16 *Peters* 367.

It has been suggested, with truth, that the question, as to

the extent or limits of the *sovereign* title, did not necessarily arise in either of the cases last cited.

In *Arnold* v. *Mundy*, the premises in dispute are stated to have been below ordinary low water mark, although one of the counsel, in argument, represented the fact differently. 1 *Halst.* 2, 44. And in *Martin* v. *Waddell*, the special verdict states · that the premises in dispute are situated beneath the waters of the Raritan river and bay, where the tide ebbs and flows, but whether above or below low water mark, does not appear. In the argument of *Pollard's lessee* v. *Hagan*, 3 *Howard* 218, counsel insisted that the decision in *Martin* v. *Waddell* did not touch the question of title to the land between high and low water mark, and that such construction of the decision would be a surprise to the people of this state.

In *Arnold* v. *Mundy*, the question, as to the limits of the right, was fully argued, and the question came directly before the court, under a claim of the plaintiff to the possession of the premises in dispute by virtue of his possession of the adjoining land; and upon that point the Chief Justice explicitly recognised the doctrine of the common law. He said, " that a grant of land, bounded upon a river or other water which is navigable, and where the tide does ebb and flow, extends to the edge of the water only, that is to say, to high water mark, and no farther. All pretence of possession, therefore, in this case, as being connected with and appurtenant to the adjacent land, must fail. The grant for that could extend only to high water mark, and it could, therefore, carry with it no part of the adjacent land covered with water." I regard this case as authoritatively settling not only the title to the soil under navigable waters, but also the limits of that title upon the shore.

The title to the *shore* of navigable rivers, where the tide ebbs and flows between ordinary high and low water mark, being vested in the state, have the legislature a right to convey the soil so as to invest the freehold in an individual ?

It is said in the books, that the title to the soil of navigable rivers, and to the shores of the sea, and of the arms of the sea, is a branch of the king's prerogative, of which he cannot divest himself; that the title is in him in trust for the public;

that the rights of navigation and of fishery, and the use of the shores of the sea, are common rights, of which the people cannot be divested, except by their consent. Hence they cannot be aliened by the crown. *Hale de Jure Maris* 11 ; *Angell on Tide Waters* 21, 24, 25 ; *Brown* v. *Kennedy,* 5 *Har. & J.* 203.

The authorities, upon this point, are by no means uniform, though the better opinion appears to be, that, since *magna charta,* the English sovereign has no power to alien the public domain.

Whatever doubts may exist in regard to the power of the king to dispose of common rights, there exists none in regard to the power of parliament. Parliament not only may, but does exercise the power of aliening the public domain, of disposing of common rights, and of converting arms of the sea, where the tide ebbs and flows, into arable land, to the utter destruction of the common rights of navigation and fishing. *Lowe* v. *Govett,* 3 *Barn. & Ad.* 863 ; *The King* v. *Montague,* 4 *Barn. & C.* 598.

This power is attributed to the omnipotence of parliament, and it is said that no such omnipotence is vested in the legislature. The legislature, it is true, is not omnipotent in the sense in which parliament is so. It is restrained by constitutional provisions. Its powers are abridged by fundamental laws. But it would seem clear, upon principle, that in every political existence, in every organized government, whatever may be its form, there must be vested somewhere ultimate dominion, the absolute power of disposing of the property of every citizen. In this consists eminent domain, which is an inseparable attribute of sovereignty. This constitutes the omnipotence of parliament. If the legislature may dispose of the property of each individual citizen for the public good, it would seem to be no greater exercise of power to dispose of public property or the common rights of all the people for the same end. The objection to an alienation of the public domain by the king is, that he is but a trustee for the community. But the legislature are not mere trustees of common rights for the people. These rights are vested in the people themselves ; the legislature, in disposing of them, act as their representatives, in their name and in their stead. The act of the legislature is the act of the

people, not that of a mere trustee holding the legal title for the public good.

The principles regulating the alienation of public property to individuals are thus clearly stated by Vattel :

" The nation, being the sole mistress of the property in its possession, may dispose of it as she thinks proper, alienate it or lawfully mortgage it. This right is a necessary consequence of the full and absolute domain. Those who think otherwise cannot allege any solid reason for their opinion, and it follows, from their principles, that no safe contract can be entered into with any nation, which attacks the foundation of all public treaties. But it is very just to say, that the nation ought to preserve its public property with great care, to make a proper use of it, and not to dispose of it but for good reasons, nor to alienate or mortgage it but for its manifest advantage or in case of a pressing necessity. This is an evident consequence of the duties a nation owes to itself. The public property is of great use, and even necessary, and it cannot dissipate it improperly without manifestly hurting and injuring itself. I speak of the public property, strictly so called, or the domain of the state. Alienating its revenues, is cutting the nerves of government. As to the property common to all the citizens, the nation does an injury to those who receive advantage from it, if it alienate it without necessity or without good reason. It has a right to do this, as proprietor of these possessions, but it ought to do it only in such a manner as is agreeable to the duties of the body towards its members."

" The prince or the superior of the society, whatever he is, being no more than the administrator, and not the proprietor of the state, his authority, as sovereign or head of the nation, does not of itself give him a right to alienate or dispose of the public property, as to its substance." " The nation, having the free disposal of all the property belonging to it, it may convey this right to the sovereign, and consequently confer upon him that of alienating and mortgaging the public property." *Vattel, book* I, c. xxi, § 257, 258, 260, 261.

In *Arnold* v. *Mundy* (1 *Halst.* 78), the Chief Justice said, " The sovereign power itself cannot, consistently with the law

of nature and the constitution of a well ordered society, make a direct and absolute grant of the waters of the state, divesting all the citizens of their common right. It would be a grievance which never could be long borne by a free people."

If, by this proposition, it is meant only to assert that a grant of all the waters of the state, to the utter destruction of the rights of navigation and fishery, would be an insufferable grievance, it is undoubtedly true. It might have been added, that such grant would have been an infringement of the constitution of the United States. But if it be intended to deny the power of the legislature, by grant, to limit common rights or to appropriate lands covered by water to individual enjoyment, to the exclusion of the public common rights of navigation or fishery, the position is too broadly stated.

The contrary doctrine is supported by numerous authorities. " We cannot doubt," says Chief Justice Shaw, in delivering the opinion of the Supreme Court of Massachusetts, " that a navigable stream may cease to be such, by the appropriation of the soil under legislative authority to other purposes," as if the legislature were to erect a solid dam across a navigable creek, and permit the land to be wholly filled up and converted into house lots. *Charlestown* v. *Middlesex*, 3 *Metc.* 202 ; *Wilson* v. *The Blackbird Creek Co.*, 2 *Peters* 245.

The view, moreover, expressed by the Chief Justice, in *Arnold* v. *Mundy*, is incompatible with very numerous acts passed by the legislature of this state. The acts which authorize the erection of dams or bridges across navigable streams, which are found upon the statute book from a very early period, the laws authorizing the erection of piers and docks, and the laws authorizing the exclusive appropriation of oyster beds to private use, are all grants or appropriations of the waters of the state destructive to some extent of common rights.

In *Martin* v. *Waddell*, Justice Thompson, in reference to the view of the Chief Justice in *Arnold* v. *Mundy*, remarked, that " if this be the received doctrine in New Jersey, in relation to the navigable waters of that state and the oyster fisheries, they remain common to all the citizens of New Jersey, and never can be appropriated to any private or individual

use; and all laws having such object in view must be utterly null and void."

These views in relation to the title of the state to the soil under navigable rivers below high water mark, and the power of the legislature to grant it, were expressed, as the opinion of this court, when this case was formerly before us upon a motion for a new trial. I should have deemed it unnecessary at this time to add any thing to what was then said by Justice Randolph, in whose views I concurred, but for the great importance of the questions in their influence both upon public and private rights, and the fact that they were discussed by counsel upon the argument, as open questions.

It remains to inquire, upon the evidence in this cause, whether any title to the *locus in quo* did or could pass to Nathaniel Budd by operation of the act of the 8th of November, 1836.

It appears, by the evidence, that the heirs of Coles, under whom the plaintiff occupied the premises in question, are the undisputed owners of the upland adjoining the cove above high water mark; that John B. Coles acquired the title by the union of two conflicting claims, in 1804, and that he and those claiming under him have since been the undisputed owners of the soil bounded by the river; that, as early as 1814 or 1815, he commenced the erection of a wharf, extending from his own land towards the channel of the river a distance of over one thousand feet, which was completed before the passage of the law in question. He also reclaimed a part of the mud flats in front of his land lying between high and low water mark, by filling them in with earth and raising them above the level of the tide. The spot where the grass was cut, which forms the subject of dispute, was filled in between April and November, 1836. At the time of the passage of the law, the place where the trespass was committed was not subject to the flow and reflow of the tide. No complaint is made of these erections as nuisances. There is no pretence that they were so: a useless mud flat had been reclaimed, and a wharf beneficial to commerce erected, and the question presented is, whether title to the land thus circumstanced passed

by the act. It is admitted to be within the bounds of the grant, but had the legislature power to grant it?

Was the title to the *locus in quo* in the state at the time of the passage of the act? The answer to that question involves another, of much more moment, *viz:* whether the title to all improvements hitherto made in the state of New Jersey by the riparian proprietors, below the original high water line on tide waters, without the expressed assent of the legislature, still remains in the state, liable to be aliened at the pleasure of the legislature; whether all wharves, store houses, dwellings, improvements of every description, made upon lands reclaimed from the tide, or below the original high water line, are held without title in the supposed owners, who are mere squatters upon the public domain. It is obvious that the inquiry affects property to an incalculable amount, and involves vast interests, which ought not to be disturbed, except upon the clearest principle. If the title to land thus reclaimed remains in the state, and if it be true, as was held by the Chief Justice in *Arnold* v. *Mundy*, that there can be no title by *prescription* in New Jersey, it is clear that no length of quiet enjoyment will perfect the title in the hands of the occupant, for lapse of time is no bar to the state.

Undoubtedly every such intrusion into the public domain may, at the common law, be relieved against, whether it amount to a nuisance or not. But it is worthy of notice that the claim of the state of New Jersey to land flowed by the tide is in no sense *proprietary*. It is strictly a *sovereign* right. The proprietary rights were at an early period severed from the sovereignty, and were vested in the proprietors, in whom, and in their grantees, they still remain. The only title which the state claims to the soil is by virtue of its sovereignty, for the protection of the public or common rights. But where the soil of navigable rivers is permanently appropriated without prejudice to the public rights, and where the state tacitly acquiesces in such appropriation, there would seem to be but little reason in her setting up a title as proprietor of the soil for no public use.

Notwithstanding the acknowledged title of the state, in her

sovereign capacity, to the soil of navigable rivers below high water mark, there has undoubtedly existed, from a very early period, rights of the riparian proprietors, which have been recognized by the legislature, inconsistent with the idea of that exclusive property in the state sanctioned by the rule of the common law.

· The convention of 1783, between the state of Pennsylvania and New Jersey, for settling the jurisdiction of the Delaware, guarantees to each state the right of guarding the fisheries on the river annexed to their respective shores. The act of the 13th of June, 1799, (*Pat.* 416, § 9,) shows clearly that the legislature of this state understood this clause of the agreement as relating to fisheries below the head of tide water, which were the subject of private ownership and individual occupancy. · It subjects the person having command of any ship, vessel, or raft, who shall anchor upon any fishing ground where shad are usually taken, and shall not immediately remove from the fishing ground, if such removal can be effected with safety, upon the request of the owner or occupier of such fishery, to a penalty of $60, to be recovered, with costs, by said owner or occupier. The right of the riparian proprietors to fisheries in the river Delaware are also clearly recognised by the act of 26th November, 1808, (*Bloomfield* 204), of 9th February, 1819, (*Rev. Laws* 65), of 15th February, 1819, (*Rev. Laws* 659), and by the existing law of 26th November, 1808, (*Rev. Stat.* 480). The tenth section of the last mentioned act provides, that if any person shall cast or lay out any seine into the river Delaware, within the jurisdiction of this state, beyond the right angle of the shore. of the river, and *where his line strikes the river at low water mark going out,* or suffer it to swing beyond the right angle of the shore of the river, and *where his line strikes it at low water mark coming in,* except by unavoidable accident, every person so offending, and being thereof convicted, shall forfeit and pay, for every offence, $25 *to the person against whose land such trespass shall be committed.*

The act of 27th December, 1826, (*Rev. Stat.* 479) which prohibits nonresidents from fishing in any of the bays, flats,

rivers, or waters within the jurisdiction of this state, contains a proviso, that nothing in the act shall be so construed as to affect the right or privilege of any owner or tenant, not resident in this state, from fishing upon or opposite to his own shore in this state. Such repeated and unequivocal legislative recognitions of a right, furnish proof of its existence which cannot be disregarded. In treating of fisheries, Mr. Griffith says, " this species of property, from the earliest times, has been the subject of exclusive enjoyment and alienation, like any other;" our courts of justice have always recognized the rights of several fishery. Trespass is sustained for intrusions and ejectments upon the possession and title, as in other cases and estates. *Griffith's Annual Law Reg.* 1290, *note* 1.

In the case of *Den ex dem. Bispham* v. *Rice*, which was decided in this court at September term, 1825, the principal object of the action was the recovery of a valuable fishery on the river Delaware. Part of the premises are described in the declaration as " a fishery." The plaintiff recovered, although this cause was tried after the decision in *Arnold* v. *Mundy*, and was earnestly litigated under the guidance of the ablest counsel, most of whom were engaged in that cause. I am not aware that a doubt was expressed as to the right or title to the fishery, in either of the parties, by reason of the paramount title of the state.

In *Bennett* v. *Boggs* (*Baldw.* 60), the Circuit Court of the United States recognized the existence of rights of fishery in the riparian proprietors upon the river Delaware within the jurisdiction of this state, and sustained the validity and constitutionality of the laws regulating and protecting them.

This right of fishery, so far at least as it regards the river Delaware, cannot rest upon any actual or supposed proprietary grant. The title of the proprietors of New Jersey never extended beyond low water mark upon the Delaware. The title of the state previous to the revolution was limited by that boundary. *Bennett* v. *Boggs* (*Baldw.* 60.)

Nor does it depend upon any statute law of the state conferring the right. The earliest legislation upon the subject of

the fisheries in the Delaware recognizes the title of the riparian proprietor as an existing right.

Nor can the claim rest on prescription. If a title by prescription can exist at all in this state, many of these fisheries are of modern origin, and cannot be prescribed for.

This claim, it is clear, is totally irreconcilable with the rules of the ancient common law touching the property in the soil and shores of navigable rivers. In *Yard* v. *Carman* (*Penn.* 936), Justice Pennington expressed himself strongly against the existence of an exclusive fishery in the river Delaware, as a violation of the principles of the common law. If the claim rested for its support alone upon the principles of the common law of England, it cannot be sustained.

The right of the riparian proprietors to an exclusive right of fishery in the tide waters of New Jersey in front of their land must rest, it is apprehended, in custom or local usage variant from the common law. There is then, I conceive unquestionably, in New Jersey a local common law affecting the title of riparian proprietors upon tide waters, and conferring upon them rights and privileges unknown to the common law of England. I use the term riparian proprietors, not in its strictly appropriate common law sense, as indicating the owner of the *ripa* or bank of streams not navigable, but in the sense in which it is frequently used in the books to indicate the owner of the land adjoining the shore of tide waters above the ordinary flow of the tide.

It remains to inquire whether this extension of the rights of the riparian proprietor, in derogation of the principles of the common law, is limited to the right of fishery, or whether it extends beyond it. It is a fact, not controverted, that, from a very early period in the history of the state, the riparian proprietors upon navigable streams have enjoyed the privilege or exercised the right of appropriating the shore in front of their lands between high and low water mark to their own use, by the erection of docks and wharves, and by filling in and reclaiming the ground from the dominion of the water. These improvements are found upon the shores of the Hudson and the Delaware, of the Raritan, the Passaic, and the Hacken-

sack, and probably of all the numerous navigable tide raters that intersect the larger portion of the state. In very n ny instances, it may be presumed, all traces of the origin i high water line are long since obliterated. No public incon uience has resulted from the practice, and no serious detriment has been occasioned to the common rights of the people of the state; on the contrary, the facilities of commerce and navigation i ave been increased, lands, which otherwise would have remain d worthless, have been by private enterprise reclaimed and ms de avail-able, and property of great and increasing value has been added to the wealth of the state. The lands thus improved have been held and enjoyed as private property, and have been taxed as such, without a doubt being entertained as to the validity of the title.

The practice must have originated here. It had no common law origin, nor could it have been derived from the Dutch settlers, for by the civil law which prevails in Holland the title of the sovereign extends as far as the highest winter flood. It may possibly, as was suggested upon the argument, have had its origin, as in other states, in some early ordinance or statute which is now lost. It is, perhaps, more probable that the practice originated in the fact, that all titles were derived from the proprietors ; that their grants upon navigable streams, in some cases in express terms, extended to low water mark, and were always understood to cover the entire shore. The proprietors both of East and West Jersey, by their original concessions, granted convenient portions of land for wharves and keys, as well as for streets and other public purposes. *Lea ing & Spicer* 20, 391.

And in East Jersey these public landings and ferries were laid out and appointed, as were highways and bridges, by persons in the several counties, designated for that purpose by the legislature. In these grants, made when the sovereign and proprietary titles were united in the lords proprietors, the public wharves and docks undoubtedly had their origin.

Prior to the decision in *Arnold* v. *Mundy*, no instance, it is believed, can be found of a law passed for the mere purpose

of authorizing a riparian proprietor to construct wharves, or otherwise to improve land, below high water mark.

The very numerous meadow acts, both public and private, to be found upon the statute book, are not regarded as an exception to the truth of this remark. They do not purport to authorize the riparian proprietors to appropriate to their use any part of the public domain. On the contrary, they authorize the owners of meadows to improve their own land, and for this purpose they subject a body of landholders to common regulations, and, in some instances, authorize the construction of dams across navigable streams. The great body of meadow thus to be improved lay above ordinary high water mark, or did not properly constitute the shore of navigable streams. These acts, therefore, cannot with propriety be regarded either as a recognition by the legislature of the title of the proprietors to lands lying between high and low water mark, nor, on the other hand, as a grant of a right to the exclusive appropriation of the public domain.

There are also laws creating corporations with extensive powers and conferring upon them the right, among others, of constructing piers and wharves, and otherwise occupying the land below high water mark. Aside from these acts, which, I repeat, constitute no exception to the truth of the remark, upon a careful examination of all the statutes, public and private, under the proprietary, the colonial, and the state governments, I find, prior to the decision in *Arnold* v. *Mundy*, no statute conferring upon the riparian proprietor the right of appropriating the shore between high and low water mark to his own use, by reclaiming the land, the erection of wharves, or in other modes.

During this period, there are found repeated recognitions of the existence of wharves constructed by the riparian proprietor. Thus, by the preamble of the act of 22d November, 1802, it appears that Nathaniel Budd, who then occupied the shore adjoining the premises now in dispute, had built a dock and ferry stairs on the river, and the legislature thereupon authorized the construction of a road to the dock, and the erection of a ferry from the dock to the city of New York. It does not

seem to have been apprehended, either by Budd or by the legislature, that any legislative authority for the construction of the dock or any express recognition of the right was at all necessary.

The earliest act which authorizes the riparian proprietor to build a dock in front of his land, was passed on the 28th of February, 1839. This act, as well as most others recently passed, confers upon the proprietor the right of constructing a dock or pier below low water mark, or some other power, for which legislative sanction may be deemed essential. The right of the riparian proprietor to occupy the shore in front of his land, does not appear to have originated in any legislative grant, public or private, nor has legislative sanction been deemed essential to its exercise.

On the trial of *Arnold* v. *Mundy,* the Chief Justice, in charging the jury, said, " the intermediate space between high and low water mark may be exclusively appropriated by the owner of the adjoining land, by building thereon docks, wharves, store houses, salt pans, or other structures which exclude the reflow of the water." This remark, it is true, was made in connection with another, which proved to be erroneous, *viz:* that the title of the adjacent owner extended to the water's edge, and fluctuated with the ebb and flow of the tide. But the remark is entitled to much consideration, as exhibiting the view of that learned and experienced judge, of what the law of the state was, before his impression had been affected by a reference to foreign authorities. Indeed it does not appear that he ever changed his opinion upon the particular point in question.

In *Griffith's Annual Law Register* 1292–3, (1821–2) it is said, that " when the original proprietors of New Jersey have, by conveyance, survey, or otherwise, alienated any part of the proprietary or common land, such grantees possess the soil, whether dry land or land covered with water, (when the grants or surveys extend to or are bounded on rivers or waters) in as full right as such soil, rivers, and waters were held by the duke of York, or Berkley and Carteret, in 1663–4, subject to the *jus publicum.* All property in New Jersey, and

whatever is the subject of property, in land or water, has some individual and exclusive owner, and such has ever been the understanding of our legislatures and courts of justice.

In a note to this passage, Mr. Griffith, in reference to the proprietary grants, says : " These grants describe the premises, and convey the fee, with all the rights and privileges of the original proprietors ; but lands bordering on rivers, bays, and streams of water are usually described as bounded by such river, &c., or up or down the river : and this manner of describing boundaries is common to all rivers or waters, whether fresh or tide waters. The construction, as to the extent of such boundaries, has always been the same, both as to fresh and tide water rivers, in respect of *private* ownership and privileges, *viz:* that the middle of the channel was the line of property between them."

These opinions were overruled by the decision in *Arnold* v. *Mundy,* and they are not cited to show what the law is. But they are important, as showing the prevalent view of the profession in regard to the legality of the claim of the riparian proprietor to erect wharves, and to occupy the land to low water mark, without legislative authority for that purpose.

The counsel for the state of New Jersey, in arguing the case of *Martin* v. *Waddell* (16 *Peters* 387), said, " the right of the riparian proprietors to wharf out to the public river is a *local custom* in New Jersey." He also said, that, " by *long usage,* the shore fisheries have grown into private rights belonging to the riparian owner ;" and these facts were relied upon in support of the view adopted by the court adverse to the claim of the proprietors.

This modification of the common law exists in other states, and the right of the adjoining proprietors to appropriate the shore between high and low water mark to their exclusive use is recognised and protected. It rests in some instances upon statute, in others upon custom on local common law.

Thus in Massachusetts, by an ordinance in 1681, it was provided that the proprietor of land adjoining the sea should hold to low water mark where the tide does not ebb and flow more than one hundred rods. The ordinance was subsequently an-

nulled, but the usage still prevails, and has acquired the force of a local common law. This ordinance never extended to Plymouth as positive law, it has nevertheless become a settled rule of property throughout Massachusetts, and also in Maine. The right, therefore, is acquired not by force of the ordinance, but by custom or usage. *Storer* v. *Freeman*, 6 *Mass.* 435; *Sale* v. *Pratt,* 19 *Pick.* 191; *Angell* 225, 226.

So in Rhode Island, the custom has been general for the adjoining proprietor to augment his land by embanking in the water, without reference to an early colonial law, which has been ascertained to exist, sanctioning the custom. *Angell* 234.

In Connecticut, there is no statute abrogating the common law, yet the usage of the owners of the land to high water mark to wharf out against their own land, forms a part of the local common law, founded on immemorial usage. *Chapman* v. *Kimball*, 9 *Com.* 38; 1 *Swift's System* 341.

In Pennsylvania, the proprietor of the adjoining land has the ownership of the soil to low water mark. This has been adopted as the common law of the state, independent of the statute. *Hart* v. *Hill*, 1 *Wharton* 124; *Ball* v. *Slack*, 2 *Wharton* 508; 2 *Smith's Lead. Cas.* 147, *note.*

Most of the Atlantic states have, either by direct legislative enactment or by force of local usage, adopted the principle, that the title of the riparian proprietor extends to low water mark, or, the title remaining in the state, that the owner is entitled to the exclusive appropriation of the shore by wharfing out or by raising the land above the tide, and that upon such appropriation the title vests in the adjoining proprietor.

In New Jersey, as we have seen, the title of the state extends, as at common law, to high water mark, but it is to high water mark as it actually exists. Where the waters have receded by alluvion, or by the labor of the adjoining proprietor, the title of the state does not extend beyond the actual high water line. That any encroachment upon the shore, or other part of the public domain, may at all times be restricted and controlled by legislation, is admitted. That any erection prejudicial to the common rights of navigation or fishery may be abated, is not denied. But in the absence of such legislative restriction,

Gough v. Bell.

where no nuisance is created, the riparian proprietor may appropriate the shore between high and low water mark to his own use. The custom of making such appropriation, long enjoyed and universally acquiesced in, constitutes a local common law, which this court will recognise, and which it would be alike unsafe and unwise to disregard.

I am of opinion, therefore, that the act of the 8th of November, 1836, did and could convey to Nathaniel Budd no title to soil from which the flow and reflow of the tide had been excluded by the improvements of the riparian proprietors at the time of the passage of the law; and inasmuch as it appears, by the evidence, that the place where the trespass had been committed had been reclaimed prior to the passage of the act, and was not then subject to the flow and reflow of the tide, that the defendant has failed to sustain her plea, and that judgment must be rendered for the plaintiff. I have arrived at this conclusion' not without anxious solicitude, increased by the fact that the bench are divided in opinion. It is a source of real satisfaction to know, that if I have fallen into error, that error may be redressed in a higher tribunal.

CARPENTER, J. I do not suppose that any title has been successfully set up by the plaintiff, except what depends upon his rights as riparian owner. It is not necessary, on this point, to add to what has already been said in the opinion delivered by Justice Randolph on a previous occasion. The different grants, the titles to which became vested in J. B. Coles, under whom the plaintiff claims, extended to the river, but they were as clearly limited to the edge of the river. The plaintiff then stands, in relation to the premises, simply in the position of a riparian owner.

On the other hand, the title of the defendant rests solely on the validity and extent of the grant of the legislature, by the act of November 8, 1836. It is obvious that the survey to Boudinot is to be laid entirely out of the question. If titles derived under proprietary grants can, under the local law of this state, extend to low water mark, the survey can be of no avail in this controversy, for the plaintiff shows a prior title. If they

extend to high water mark only, it is of as little avail, for the survey was laid upon land which, at the time it was made, was entirely covered with water. It forms no ground for the commencement of an adverse possession, for I am not aware, from any thing in the case, that the defendant, or those under whom she holds under color of title from that survey, ever made any improvements or reclaimed any land previously covered with water. Nathaniel Budd, who built or extended a wharf on the ground covered by the survey, and established, or attempted to establish a ferry, did all this, not under this survey, but under the authority of an act passed in 1802, prior to the survey, and while he held the ferry house and premises under the Kennedy title, which is now vested in the plaintiff.

The premises described in the plaintiff's declaration include some land not comprised within the bounds of the survey, as claimed by the defendant, being land which was above high water mark in 1804, when the survey was laid. The plaintiff seems to suppose, the plea of title being general to the whole premises described in the declaration, that he will therefore, at all events, be entitled to judgment in the present suit. But it is well settled otherwise, and the very point has, not long since, received the consideration of this court. The plaintiff is not bound to carry his proof of trespass to every part of the close mentioned in the declaration, nor is the defendant bound to support his justification to all parts. It is sufficient for the defendant if he show title to so much of the premises as includes that part on which the alleged trespass was committed. The record, it is said, would be decisive evidence in a future action; but it would be evidence only as to the part of the place in dispute, and it would be necessary to show by proof which part it was. *Phillips* v. *Phillips*, 1 *Zab.* 42; *Bassett* v. *Mitchell*, 2 *B. & Ad.* 99; *Smith* v. *Royston*, 8 *M. & W.* 381; *Dorman* v. *Long*, 2 *Barbour's* (*N. Y.*) *R.* 214.

The plaintiff, then, is a riparian owner, and it will be necessary to examine the extent and character of his rights to the shore, in order to test the validity of the title by grant set up by the defendant. This inquiry involves questions in which not

only the rights of this plaintiff, but of many other citizens, to very valuable property in this state are involved. Wharves, docks, embanked meadows, &c., to a vast extent, have been erected and improved on the shores of our tide waters, in regard to few of which has any special authority been sought from the legislature, nor, until very lately, has it been supposed that such authority was necessary.

It must be admitted that, in the country from which we have chiefly drawn our rules of law, the doctrine now to be considered has long been well settled. According to the common law rule, the boundary of the riparian owner, in streams above the tide, extends *ad filum medium aquæ:* he is *prima facie* the proprietor of half the land covered by water. If the same person be the owner of lands on both sides of the river, he owns the whole river to the extent of the length of his lands, subject to the *jus publicum,* if the river be navigable and a highway. Again, on the seashore, the bays and arms of the sea, and in navigable rivers where the tide ebbs and flows, the title of the riparian owner (meaning by this the owner of land bounded by such waters), unless by royal grant or prescription, extends only to the shore or high water mark. The shore, or space between ordinary high and low water mark, as well as the bed of the river or arm of the sea, is said to be vested in the king, in trust for the common benefit of all his subjects. Whatever opinion may have formerly been entertained, it seems to be now settled, that though held by the king, and subject to be transferred by his grant since *magna charta,* the right of property in the bed or shore of the sea and its arms can only be transferred subject to the *jus publicum,* the common right of navigation, &c. While the soil of the shore is said to be the property of the crown, and has been communicated, in many instances, by grant to the subject, yet it can only be in subservience to the public right of the subjects of the realm. The private right of the crown may be disposed of, but the public right of the subject cannot, even if it be within the terms of the grant.

This prerogative notion of the *jus privatum,* which has for its object the personal aggrandisement and emolument of the

king, is, however, there carried to a greater extent than can be deemed applicable to our situation or to the character of our institutions. The common law is adopted by us, not absolutely as it prevailed in England, or even here before the revolution, but as modified by our institutions. This doctrine probably originated in the policy of the law of England, to assign to every thing a certain legal proprietor. Those things not capable of being exclusively occupied and enjoyed naturally fall theoretically, and to some extent practically, under the dominion of the sovereign, from whom, by fiction of law, all titles are mediately or immediately derived. The doctrine may thus have been established, and the title of the king in the tide waters, or the land under them, which he held for the common benefit of the people, as their representative, while it served to carry out this fiction of his being the universal occupant of all property destitute of other owner, had also its obvious practical end. The public use of these highways was properly and effectually protected by thus placing them in an especial manner under the protection of the sovereign, as the general conservator of the public rights and immunities. Here though we may properly reject the mere doctrine of the *jus privatum*, yet still the title which the king held, as trustee for the people, may be considered as lodged in the sovereignty of the state.

But while in England the king holds the right of property in the beds and shores of tide waters, as the trustee of the people, and his grants are subject to public rights, yet parliament represents the people themselves, and, uncontrolled by any supreme constitutional law, may grant the rights of the people. Acts of parliament have, it is believed, in some instances been passed, by which the public rights to the shore have been transferred to individuals, in order to be reclaimed, the effect of which has been to cut off the adjacent owner from all access to the water. One instance of such legislation gave rise to the case of *Lowe* v. *Govett*, 3 *B. & Ad.* 863, in which not the validity, but the precise extent of such parliamentary grant was drawn in question

But the omnipotent effect (if I may use the phrase) of an

act of parliament, in the absence of any supreme law by which ordinary legislation can in that country be controlled, causes such grants to be there considered in a very different light from that in which they may be here considered, in reference to the rights of the riparian owner. Here, if he have any special and peculiar rights from his position as such owner, however derived, I think it may be assumed that they are within the protection given by the constitution, of which he can be divested, even for public use, only after due compensation. It is a principle, which may be assumed without questioning in the least the power of the legislature to grant or control mere public rights, compensation must be first made before the citizen can be required to give up his property for the benefit of the community at large, much less may the property of one person be taken without his consent, and given to another. Such legislation would be repugnant to the first principles of justice, and has been held void, not merely upon the special provision of constitutional law, but upon those great fundamental principles which support all government and property. Even in England these principles have been supposed, by many judges, to be sufficient to check and control the regulations of an act of parliament. But here it has often been ruled, upon grounds which cannot be gainsaid, that the government cannot take the property of one citizen, for the mere purpose of transferring it to another, even with compensation, when the public are not interested in such transfer. If property cannot be taken for private purposes, even with compensation, much less may it be taken without compensation. In either case, as has been said, the ruling is so evidently founded on principles of natural justice and reason, as not to need the aid of either argument or authority. *Rogers, J., in Lambertson* v. *Hogan*, 2 *Barr.* 24. See 1 *Kent* 451, 455, *and cases; Angell on Watercourses*, § 461 (*ed.* 1850); *Nevius, J.*, 3 *Harr.* 203; *Story, J.*, 2 *Peters* 658; 18 *Wend.* 14; *Ib.* 56; 1 *Barr.* 314; 5 *Ib.* 145; 10 *Ib.* 338; 4 *Hill* 140.

Independent of technical ownership, there are *dicta*, if not decisions, to show that the riparian owner in this country has peculiar rights, incident to his position, which will be protected

Gough v. Bell.

and maintained. "He has," said Justice McLean, in *Bowman's devisees* v. *Waltham*, 2 *McLean* 376, (cited in *Angell on Tide Waters* 171) " the right of fishery, of ferry, and of every other right which is properly appendant to the owner of the soil, and he holds every one of these rights by as sacred a tenure as he holds the land from which they emanate. The state cannot, either directly or indirectly, divest him of any of these rights, except by the constitutional exercise of the power to appropriate private property for public purposes ; and any act of the state short of such appropriation, which attempts to transfer any of these rights to another, without the consent of the proprietor, is inoperative and void, and can afford no justification to the grantee in an action of trespass." Indeed access to the water was held, in a late case in Pennsylvania, to be a vested right of such owner, of which he could be deprived for a public purpose only after just compensation, and that an act would be unconstitutional which gave no equivalent for the value of the landing. *Pittsburgh* v. *Scott*, 1 *Barr.* 314, 315.

If the doctrine, as thus propounded, can be maintained, the right of fishing upon his shore, the right of ferry, the right of access to the water, and even the right of accretion, belong to the shore owner, as incident to his position ; it would seem to follow, that no grant for a mere private purpose can be supported which interferes with the established rights of such owner : it would simply be to take the property of one citizen, in order to transfer it to another. But I do not intend to discuss whether this doctrine, as thus broadly stated, can be supported, as I believe it to be clear, that under the local law of this state, to which I am about to refer, the plaintiff has a title which is beyond the reach of such legislative grant.

It has, undoubtedly, been the policy of this state (as of other states in this country) to encourage embankment and improvement upon its shores, and particularly of the marshes and flats along its tide margin, which are entirely useless in their original condition without the aid of art and industry. The safest and best encouragement has been given to the expenditure of labor and capital, by permitting the riparian owner to extend

his shore as far as expedient, and as far as it might be extended, without interfering with any public right. The public, under this policy, have been accommodated with landing places essential to commerce and to travel, and valuable and productive meadows have taken the place of offensive and useless wastes. In regard to wharves, it was said, by one of the learned counsel in *Martin* v. *Waddell*, (16 *Pet.* 387), that the right of the riparian owner to wharf out into the public river was a local custom in New Jersey. The remark was an admission by counsel against their case, and recognized the existence of an usage, which I think unquestionable, in the local history of New Jersey. It explained a fact, which might otherwise, perhaps, have been used against them, by referring it to the local common law of the state, which by the explanation was limited in its application. The right of the owner of the adjacent land to appropriate the shore, by building wharves, docks, or other structures, by which the reflow of the water might be excluded, was recognized by Chief Justice Kirkpatrick, in *Arnold* v. *Mundy* (1 *Halst.* 10), though in different stages of that cause he seemed to vacillate between the local law of New Jersey and the common law rule. One of the counsel of the defendant, on the argument of this cause, was constrained to admit that such had been the practice and the privilege of the riparian owner, though he denied the right.

To the same policy we owe our successive meadow laws, which seem like so many recognitions of the right, as well as of the custom of the riparian owner, to embank the low grounds on the margin of our tide waters. They apply, in very terms, to those grounds " usually overflowed by the tide." *Rev. Laws* 82.

This right or privilege to wharf out or embank is undoubtedly subject to all the restrictions necessary to secure the rights of the public. Public rights, as of navigation for instance, are undoubtedly paramount, to which those of the riparian owner must yield when they come in conflict. The absolute rights of the state to control, regulate, and improve for public purposes the navigable waters within its limits, will not be disputed, by which the rights of such owner may be incidentally affected,

perhaps, to some extent, without bringing his case within any constitutional restriction and without entitling him to compensation. And yet under the local law of this state, as I take it, the wharves and additions so made become part and parcel of the upland to which they are united, and the property of such owner, except against the state, when she proceeds in the legitimate mode of indictment or information for the protection of the public rights.

In England, if a wharf or other structure be extended into the stream below high water mark, it is considered a purpresture or encroachment, which, by the aid of legal process in the appropriate court, he may demolish or seize and arrest at his pleasure. It may not be necessarily a nuisance, though a purpresture. *Hale de Jure Maris, Hargr.* 85. The king may seize upon the encroachment, not, so far as I have been able to ascertain, by the direct action of himself or his alience, but by information filed in the Court of Exchequer, for the protection of the *jus privatum*. The remedy for purpresture, it is laid down, is either by information of intrusion at common law, or by information at the suit of the attorney general in equity. The attorney general then, on the part of the crown, may proceed for the purpose of protecting either the *jus privatum* of the crown from purpresture, or the *jus publicum* from nuisance, by information in equity and personal decree. See *Angell on Tide Waters* 200 ; *Eden on Injunc.* 223, 260, *and cases.*

Undoubtedly here any encroachment may be prevented or arrested by the proper action of the state; or if made, and it interfere in any manner and to any extent, even the least, with public rights, it may be declared a nuisance, and abated. But rejecting the mere prerogative notions of the *jus privatum*, the state, after she permitted and encouraged the erection of wharves, docks, and other additions to the upland by the riparian owner, cannot then convert them to her own use without compensation, or transfer a title to some third person as her alienee. If wharves and docks be erected under the sanction of the local law of the state, it seems equally clear that their

use and value cannot be destroyed by a grant in front or around them.

It is sufficient, to dispose of this case, to establish this modification of the common law, and that, under this local rule, the accessions to the upland of the plaintiff were lawfully made. In this I fully concur in the opinion delivered by the Chief Justice; but I do not feel at liberty to stop here. I am strongly impressed with the belief that, under our local law, the title of the riparian owner, as derived from proprietary grants, extends to low water mark. Of course, if so, it is to be understood in a qualified sense, and subject to the public rights of navigation, &c., as already more particularly remarked upon. If the local rule can be shown to go to this extent, the plaintiff shows a prior title, which it will not be pretended can be destroyed by mere legislative grant to another.

The common law in regard to the shore has been much modified in this country, not by statute merely, but by usage. It is not necessary to recur to the cases cited, which are mostly collected in *Angell on Tide Waters*, to show in how many of the states of this Union the title of such owner, subject to the *jus publicum*, is held to extend to low water mark. In many, the title of the owner on the margin of tide waters is held to reach to that extent, in so many indeed, that perhaps it may not be improper to state it as the general rule of this country. I am not aware that in this state, prior to this cause, the point has ever been distinctly presented for judicial consideration. In *Martin* v. *Waddell* and in *Arnold* v. *Mundy* there are *dicta*, but in neither case was it necessary to consider the title of the riparian owner, whether it went to low water mark or not; and the remarks of the judges in regard to the common law rule were merely incidental to the principal question, and ought not, therefore to be considered as governing this case. The common law rule, as to the ownership of the shore, was correctly stated; but whether it had been adopted in this state, did not arise in either of those cases, and cannot therefore, in my judgment, be considered as decided. It will be seen, from the statement of the case in *Arnold* v. *Mundy* (1 *Halst.* 2), that the oyster bed which gave rise to the controversy was

bare only at very low tides, but was below ordinary low water mark. The plaintiff claiming under a survey from the proprietors of East Jersey, it was sufficient to defeat his action that such title could extend only to the edge of the tide water, whether that margin was at high or at low water mark. Notwithstanding the *dicta* of Chief Justice Kirkpatrick, undoubtedly entitled to much weight from his learning and experience, but who seems at different stages of the cause, as already said, to have hesitated between the common law rule and the local usage of the state, the decision really goes no farther, than that a grant bounded upon a navigable river extends to the edge of the water only, and so is the syllabus of the reporter. It may be added, that the remark of the learned Chief Justice, argumentatively in his charge to the jury, that all pretence of possession, as being connected with, and appurtenant to the adjacent land, must fail, would be equally applicable whether the title extended to high or to low water mark, the contest being in regard to land below low water mark. In *Martin* v. *Waddell*, the jury found that the premises in dispute were situated beneath the waters of the Raritan river and bay, where the tide ebbs and flows. The jury further found that the defendants in the ejectment were in possession, and had complied with the regulations of the act of assembly, which regulated the setting apart land under water for the purpose of oysters. (See 16 *Peters* 379, 380). This, as well as the prior case, involved, as is. well known, the right of the proprietors to make grants of land covered by the tide waters of the Raritan bay and river; but in neither was the question as to the margin in relation to the rights of riparian owners drawn directly in question. What was said on that point was, in both cases, only incidental to the main question.

In *Bennett* v. *Boggs*, *Baldw.* 60, it seems to have been taken for granted, by the counsel on both sides and by the court, that the rights of the proprietors, as riparian owners, extended to low water mark in the Delaware, though no farther, and that to that extent they might claim title. The same rule has been sometimes otherwise incidentally recognised, in regard to which the meadow laws may be again referred to.

The titles of the holders under proprietary grants are recognised, and they, or a majority of them, are enabled to act in concert for the improvement of their meadows, under regulations specially provided for in those laws. So, also, the act, passed February 20, 1830, to secure the public revenue arising from lands let for planting and taking oysters, which in the ninth section saves certain rights to persons claiming from the shore to low water mark, under and by virtue of a grant from the proprietors. *Comp.* 306.

Shore fisheries belonging to the riparian owner, and annexed to his soil, except as separated by conveyance or devise, and thus turned to an easement, have by long usage become the unquestioned subjects of private property. They are closely connected with the local law in regard to the shore, and the title to this species of property has been repeatedly recognised by legislative acts and judicial decisions.

But all this is referred to merely in corroboration of the inference which I would draw from the universal understanding of the profession and others, as to the local rule previous to the construction lately given to the cases of *Arnold* v. *Mundy* and *Martin* v. *Waddell.* Until of late, it was universally supposed that in this state the title of the riparian owner extended to low water mark. The usage in regard to proprietary grants, so far as I have been able to learn, has been in accordance with 'that understanding. In the many original surveys and subsequent conveyances of land bounding on the tide waters of the Delaware and its tributaries, which have come under my observation, I have no recollection that I· have ever seen an instance in which, if the margin was defined, the document did not call for low water mark. I have made considerable inquiry of experienced surveyors and scriveners in the lower part of the state, and have been informed that in that section titles to land on tide waters extend to low water mark, and that such is invariably the case when the description defines the margin. (*a*) The flats on the shore, previous to embank-

(*a*) The surveyors general of East Jersey and of West Jersey, it is understood, have made like answers to inquiries addressed to them by the Chief Justice. *T. P. C.*

Gough v. Bell.

ment, have always been held by such title, and until of late,
since the supposed adoption of the common law rule, I have
never heard of even an attempt to defend, in trespass or other
action, on the ground that the title of the plaintiff, as riparian
owner, did not extend below high water mark.

The origin of this local rule does not seem difficult of con-
jecture. The first surveys were made by the proprietors, when
they held both the government and ownership of the soil, and
when their power to grant to low water mark will not be
questioned. The royal grants to the proprietors, through the
duke of York, conveyed a title to low water mark on the ex-
terior tide waters of the province, certainly on those of the
Delaware. As a question of jurisdiction, those grants were
unquestionably to that extent, and subject to the *jus publicum*.
I suppose the right of the proprietors to the soil, to the same
extent, to be equally clear. They granted titles to the same
extent. The policy and usage of the state I have before re-
ferred to. In 1702, the proprietors surrendered to the crown
all the powers of government, but reserving all their rights of
property in the soil. The construction of those grants and of
this surrender is to be found in the uniform practice of the pro-
prietors, never questioned by the state from that time to the
present. The proprietors, and those holding under them, have
so made grants to the present day, and, until of late, without
question as to the title conferred. Vast improvements have been
placed on the shore upon the faith of that title. It will astonish
and alarm owners of land bounding on the tide waters of the
state, if, after a usage such as I have referred to, they practically
learn that they hold them only by the forbearance of the state.
I have no personal knowledge of the usage in East Jersey,
though from the character of two small surveys, in the survey
of the common lands of Bergen, brought before us, as well as
from other obvious considerations, I infer it to be the same as on
the Delaware.

The act complained of in this case as a trespass, and justi-
fied on the ground of title in the defendant, a title resting on
the alleged grant by the state, was done on ground reclaimed
by the plaintiff, or those whom he represents. Large sums of

Gough v. Bell.

money had been previously expended for the same object, but this spot had been reclaimed, as appears by the evidence stated in the case prior to the time when the act was passed by which it is contended this land was transferred to Budd. The title of the act under which the defendant claims purports to relate only to the right of the state to land under water, and the preamble speaks of it as land lying on each side, and in front of a ferry wharf. I do not doubt but that this act, by aid of the title and preamble, might be so construed as to hold that, if intended as a conveyance at all, and not as a mere release, it was not intended to convey any land raised above water at the time of its passage, or even in progress of being raised. Deference to the legislature would seem to require such construction, for we cannot suppose they meant to transfer the land so raised by the capital and labor of one, by a mere arbitrary act of sovereign power, to another, with no public object in view, but for the mere private benefit of their alienee. We are not however, in order to escape such injustice, obliged to resort to any nice construction of the words of the act. If the riparian owner may lawfully extend his shore, then the plaintiff has a vested right, which is not the subject of such legislative grant, nor, under the act in question, can the grantee of the state exercise any right on that shore which will interfere with the established rights of the riparian owner. But if, as I strongly think, for the reasons I have endeavored to state, the title of the riparian owner under our local law technically extends to low water mark, still less can such grant be supported. In either case the judgment must be for the plaintiff.

But another point has been urged by the counsel of the plaintiff, which, perhaps, ought not to be passed without notice. It is said that the title set up by the defendant under the grant of the state must fail because of false suggestion, and the consequent imposition practised on the legislature, apparent on the face of the act.

It appears that Budd, who applied for the law, held, in 1802, under the heirs of Archibald Kennedy, a part of the premises now belonging to the plaintiff. The title of Kennedy was controverted by the trustees of the town of Bergen, but the titles

or claims, both of Kennedy and of the trustees, were, on the
4th of February, 1804, purchased by J. B. Coles, and are now
vested in the plaintiff. In 1802, Budd, a mere tenant, pro-
cured an act to be passed, which—reciting his tenancy under
Kennedy—that he had built a dock or wharf for the pur-
pose of a ferry, and established a ferry ; that his undertaking
was of general utility, but that he was unable to proceed in
his contemplated improvements for that object in consequence
of the controversy in regard to the title—authorised him to
appropriate two acres of the property in dispute, then in his
occupancy, for the purposes of a ferry, and to lay out a road
to it from the Newark turnpike. Such legislation in favor of
a mere tenant upon the rights of a landlord, without more ex-
planation than appears, seems to be somewhat remarkable,
even if there was a conflicting claim of title. The act, how-
ever, further provided a mode by which the value of the pro-
perty appropriated by him for this supposed public purpose
should be ascertained, and, when the controversy as to the title
should be finally decided, then paid to those entitled to it. If
those ascertained to be the owners should be unwilling to sell,
they might retain the property, upon paying Budd the value
of his improvements. *Act* 22d *November*, 1802, *Pamph.* 152.
How long Budd maintained the ferry, under what circum-
stances or on what terms he abandoned the enterprise, does
not appear in the case; but he did subsequently abandon it,
and the premises, with the improvements, if any were made,
were given up to the owners of the property. Budd, it seems,
at the time of the passage of the act of 1836, did not own one
foot of land adjoining the shore to which that act was intended
to apply. It is true he had, on the 2d day of January, 1804,
taken a deed from Elisha Boudinot for the survey, laid on 21st
May, 1803, on the flats in front of the property belonging to
Kennedy, and then in the tenancy of Budd. But this survey
gave no title. As before said, if proprietary grants could ex-
tend only to high water mark, it was of no avail, for it was
laid upon flats ordinarily covered by the flow of the tide. If
such grants could extend to low water mark, then there was
a prior title.

The titles upon that shore, being in this situation, subsequently it seems to have been supposed that the dormant claim of Budd under the Boudinot survey might be made available for the purposes of speculation.  The case shows that, on the 1st of October, 1835, he conveyed all his title to that survey to Willis Hall, the consideration, expressed on the face of the deed, being the large sum of $25,000.  There is nothing in the case to show that Budd, when he made this conveyance, had the slightest pretence of title on that shore; except under this survey, and standing upon this alone, it is not seen how his claim could be worth as many cents.  Coles, the riparian owner, and those under whom he held, had previously expended many thousand dollars upon the shore, and Coles, in 1836, was engaged in making additional expensive improvements.  It is urged that under such circumstances, in 1836, Budd applied to the legislature, and that his suggestions appear upon the face of the act which he obtained.  It is said that he represented himself to be a riparian owner, and, also, to hold a doubtful title under the Boudinot survey to the flats in front of him.  The preamble of the act, which is to be taken as the suggestion of the party, does seem to be capable of such construction.  It states the representation to be, that Budd became seized and possessed of 53½ acres at Harsimus, by virtue of a deed from Boudinot, "which said tract of land was surveyed to the said Elisha Boudinot, and located by special order of the proprietors of New Jersey, in *front and on each side of the ferry wharf of Nathaniel Budd, at Harsimus*," &c., and that doubts had been suggested as to his title, by reason of some supposed title in the state of New Jersey.  The state of New Jersey had never descended to speculate upon the accidental value of a shore in a particular locality.  With that liberality which has always characterized her, and apparently intending to carry out her previous generous policy towards a supposed riparian owner, having a meritorious but doubtful title to the shore, by the act which follows this preamble, she conveyed, or, more properly speaking, released all her title in the survey referred to to Nathaniel Budd.  I say released, for, notwithstanding the phraseology of the enacting

clause, the legal character and effect is to be adjudged from
its intent and meaning, rather than from the mere words em-
ployed, if that intent and meaning be obvious. It has been
frequently so adjudged in regard to conveyances, (a) and this,
as a private act, is to be treated as a mere instrument of con-
veyance, which binds only privies and not strangers. *Dwarris*
634–5; *Greenl. Cruise, Lib.* 3, *tit.* xxxiii, *secs.* 32, 39, *&c.*
Possibly, then, this act might be construed simply as a release,
as the recital seems to show that its intent was to confirm the
doubtful title of Budd, by releasing any supposed or possible
title of the state.

But, passing by what might be said as to the construction of
the act in this respect, which it is unnecessary to consider, it
is urged that the material matters so suggested were, as ap-
pears by the case, entirely untrue. Budd was never *seized or
possessed* of the flats covered by that survey, either in fact or
in law; he had no actual possession, none such is pretended,
and the survey conveys no title upon which a possession by
construction of law could be supposed to rest. But it is not
upon this merely that the point is pressed. The preamble
suggests, in direct terms, that the survey was located in front
and on each side of *the ferry wharf of Budd.* In this con-
nection, it is asserted that this is equivalent to an assertion
that he was the owner of that wharf, and, as such, placed him
before the legislature on strong grounds when he asked to be
confirmed in his title to the flats in front of that wharf. If this
be taken as the meaning of the suggestion, the evidence in the
case certainly shows that it was utterly untrue, for Budd did
not own that ferry wharf or one foot of the upland adjoin-
ing. The wharf which he had once held in possession for the
use of the ferry, already referred to, and then projected, he
had long before abandoned. The wharf, as well as the land
adjoining, was the property of John B. Coles. It is alleged
that a grant by private act obtained from the state by such mis-
representation is void.

Grants by the state by private acts, in regard to their valid-
ity, seem to stand much on the footing of grants by the king,

(a) See *Den* v. *Camp and Jessup,* 4 *Har.* 148.

and the doctrine is well settled that the king's grants, if obtained by false suggestion, are void. 2 *B. C.* 348 ; *Com. Dig.* " *Grant* " (*C.* 8, 9); *Bac. Abr.* " *Prerog.*" (*F.* 2) ; *Chit. Prerog.* 397.

If it appears on the face of the grant that the king was deceived by false suggestions the grant may be treated as absolutely void, whenever the title is incidentally drawn in question, as in *Legat's case,* 10 *Co.* 109, where it was so ruled on ejectment. It does not seem necessary that it should be set aside or declared void by direct proceeding. See *Parmenter* v. *Gibbs,* 10 *Price* 412; 2 *Rol. Abr.* 191 *S. pl.* 2, *cited Chit. Prerog.* 330, *note.*

This doctrine in regard to private laws, when obtained by misrepresentation, is here of great importance, where special legislation is so readily obtained without notice to other parties to be affected. The mischief is one · scarcely to be avoided under the facility which attends the most enlightened legislation, and private rights seem to need for their protection the application by the courts of these sound principles by which its inadvertencies may be corrected. In this case it seems difficult to resist the conclusion which is the object of the argument so presented to the court ; but it is not necessary to express any decided opinion upon this point under the view taken of another part of the case.

RANDOLPH, J. When this case was before us on a former occasion, it merely appeared that the *locus in quo* (where the alleged trespass was committed) was below what was formerly the high water line, and the conflict was between the rights of a riparian owner, who had docked or filled out below high water, and the grantee of the state below and up to that point. 1 *Zab.* 156. The court decided in favor of the latter, and allowed a new trial upon the common law principle, that the rights of the riparian owner did not extend below high water, and that the grant of the state was good and effectual to cover the premises. Neither of these positions, as I understand, are directly controverted at this time by the court ; but, as the case now comes up from the circuit, the point of the alleged tres-

pass is defined to be between high and low water line; and a local common law of New Jersey is urged as extending the rights of the plaintiff, the riparian owner, to low water line, either as owner of the soil or for the purpose of constructing thereon a dock. If the plaintiff has been successful in maintaining his position, it will enable him to recover in this suit, although the defendant's title to the whole of the fifty-three acre tract will be good, excepting so much thereof as lies above low water line or as is covered by the prior constructed wharf.

Although the opinions delivered in the cases of *Arnold* v. *Mundy*, *Martin* v. *Waddell*, and *Gough* v. *Bell*, covered this question, and considered the whole matter settled up to and below high water mark, yet, as the right to the shore between low and high water mark was not necessarily strictly involved in either case, it cannot be considered as definitely settled. If the case really depended on the priority of time between the date of the defendant's grant and the time of the filling out the plaintiff's dock, I should have some hesitation in giving judgment for the plaintiff on that ground; for the defendant's grant, which covers the *locus in quo*, is dated the 8th of November, 1836, while the evidence of plaintiff's right, acquired, if at all, only by filling out, reads thus: "Where the grass was cut, was done (*i. e.* filled out) between April and November, 1836, it was done by the 10th November, at any rate." But, according to the view which I shall take of the case, it will not depend on this question of priority. It is certainly correct that several of the states have adopted a rule different from that of the common law, in extending the rights of the riparian owner to low, instead of to high water line: thus in Massachusetts the rule has been adopted to extend the line to low water, provided it is not more than one hundred rods from high water mark; but this rule or law was settled by a colonial ordinance of 1641; and although it did not extend in terms to Plymouth or the province of Maine, and was in effect repealed by the repeal of the charter, yet it established the rule, which has ever since been followed in both Maine and Massachusetts. *Angell on Tide Waters* 224, 226. A similar rule was established in Rhode Island under the sta-

tute of 1707, *Ib.* 236 ; and in Pennsylvania and Maryland they have also statutes on the subject, which permit the riparian owner to wharf out to low water. *Angell* 235, 247. Whether there is any statute in Connecticut, I have not been able to ascertain, but presume the rule adopted has been based on some early and definite action of the legislature or courts. In New Jersey we have no such statute, nor have I heard of any such rule being insisted on until the second argument of this cause. What was said by the learned counsel, in *Martin* v. *Waddell,* only referred to the practice, which had obtained in the state, of erecting wharves without an act of the legislature, and to no special custom which then existed, and under which a right was claimed. Until the decision of *Arnold* v. *Mundy* a very general impression prevailed that all the unlocated land in the state, whether under water or otherwise, belonged to the proprietors, and neither the state nor any of its citizens felt sufficiently interested to scrutinize the encroachments of the land owners upon the water ; and as the proprietors sold their locations by the acre, it is presumed that they would extend the survey as far into the water as any purchaser desired to go. The survey of this very tract to Budd, in 1803, for fifty-three acres of land entirely under water, is evidence of the fact. Indeed the practice is, that the purchaser of the proprietary right of location places his survey where he pleases, the proprietors giving no warranty title ; but this is considered evidence of no rule or common law, that the rights of either the proprietors or their grantees extend below high water mark. As a general rule, when the proprietors themselves made the deed or patent (as they formerly did), the bounds were not extended beyond high water ; and in all three of the suits, when the riparian owner has claimed to go below high water, the claim has been not by the force of his boundary or description, but in consequence of his ownership of the upland. I have examined, in the office of the secretary of state, a large number of patents, and I have not found a single deed which calls for a line below high water ; in general, they are merely bounded on the river or bay, as the plaintiff's deeds are in this case. Numerous deeds may be found

describing the water line thus: " on the west side of Hudson river," " lying along on the west side of Hudson river," " lying and being on the west side of the bay that leads up into Hudson river, and so stretching along said bay," " along the east side of the Delaware river ;" and the grant to the town of Woodbridge, in Middlesex county, is " bounded on the east side of Arthur Kull river, otherwise called the sound." It is dated in 1669, and under that line of description extends from the Raritan river around to the mouth of the Rahway river. And the deeds from which these descriptions are taken extend up each side of the plaintiff's land for many miles, showing that at that time there was no general custom or common law prevailing in that part of the state that riparian owners should go farther than the common law rule allowed.

These are all East Jersey deeds. With regard to those in West Jersey, I have not been successful in my investigation, but think it not improbable that some, perhaps many, may there be found which call for the low water line, for this reason, that the boundary of the state under the grant from the duke of York is different on the western, from what it is on the eastern side of the state. With the latter, it embraces all the water and water rights that a state can claim under a general boundary on the ocean, arm of the sea, bay, or navigable river, whereas on the west it is the land or country lying east of Delaware bay or river ; and this description only extended the right of the proprietors or state under the grant to low water on the Delaware bay and river, though, by the declaration of independence and the compact with Pennsylvania, it was subsequently extended and settled to the middle of the bay or river. 1 *Chal. Opinions* 59 ; 4 *Wash. C. C.* 384, *Corfield* v. *Coryell*; 1 *Bald.* 140, *Bennet* v. *Boggs ;* 5 *Wheat.* 374

Then, as neither the sovereignty nor propriety of New Jersey on the Delaware extended beyond low water mark, it is not improbable that deeds would be made or considered as extending to that line, for the proprietors would have no object in leaving the shore without owning the land or river to which it might be attached. The common law jurisdiction would extend to low water, and convenience would extend the right of

the soil as far, when another sovereign would be the owner of all below that point. Indeed, although the proprietors, standing in the place of the king, might grant the shore by express words, though not by implication, *cum littore maris eidem adjacente*. *Hale de Jure Maris*, ch. 403 ; 3 *Kent*. 347 ; *Blundell* v. *Cottrell*, 5 *B. & Ald*. 268 ; *Davies* 149. Yet it may be doubted whether the right to the shore could originally exist, unless as dependent on the upland or the river.

These remarks have been made for the purpose of showing, that although along the Delaware there may be some reason for supposing that the common law rule may not prevail to its fullest extent, yet if it does not, that there are some special reasons operating, which do not exist in other parts of the state, particularly in the part where this controversy arises ; and also, as showing a sufficient reason why the impressions of professional men and others in the western part of the state was, that the rule, as regarded the land owners, was the low, instead of high water line. Indeed, prior to the decision of *Arnold* v. *Mundy*, it was their impression that the entire bed of the river was private property. *Griffith* 1291.

It has also been urged, that the right of fishery, which exists in the Delaware, and perhaps some other rivers in the state, and the sanction which has been given them by the legislature, and also the legislative acts for the protection of low meadows sometimes covered by the tide, afford at least a persuasive evidence of the existence of a rule different from that of the common law. After a very full consideration, I am unable to give the argument the weight which is claimed for it ; so far as it applies to the Delaware it may be embraced in the considerations already stated ; in regard to the whole matter, the very fact that the authority of the legislature was constantly invoked, would seem to raise a doubt of the general or special common law authority. But although the right of fishery, like the right of way or the right of common, may be severed from the farm or manor, and any appropriate suit or action may be brought respecting it, yet it is dependent on the upland for its existence, and does not in fact exist, in gross or

by any common law rule, detached from and independent of the land. *Griffith's Law Reg.* 1295, *note.*

Whether a man's land extends to high or to low water, he has the exclusive right of fishery and ferry appendant thereto, that is, the right of hauling seines or landing thereon. Any man may fish or sail his boat opposite; he only can fish and land on it, and without this latter privilege the fishing and boating are of little value; and hence his right of fishery. Whatever regulation the legislature may make does not affect the question under consideration: and so of the acts respecting the meadows, and perhaps some other statutes; although reference may be had to rights to low water mark, they must afford but weak and defective evidence of an existing, permanent, and general custom or rule of the place different from the well settled principles of the common law. But it is said the rights of the riparian owner extend to and in the water; that they are vested rights, of which he cannot be deprived. In the language of Judge McLean, in *Bowman's devisee* v. *Waltham,* 2 *McLean's C. R.* 376, "the right of fishery and ferry, and every other right which is properly appendant to the owner of the soil," the riparian owner holds " by as sacred a tenure as he holds the lands from which they emanate." No doubt a man's water rights are as sacred as those to his freehold, and a railroad or canal company, or an individual, can no more cut him off from the enjoyment of the one than from the use of the other; both are alike under the protection of the law and the constitution. But the question is, what are these appendant rights in salt water or navigable streams? Because a man bounds on the ocean or a canal, it does not follow that he has any greater right to ·appropriate the subject of his boundary in the one case than in the other. There is a vast difference between a right and a privilege. The owner of a newly created cottage may enjoy the privilege of opening his windows upon a view of his neighbor's beautiful gardens, lawns, and privacy, but he has no right to do so, and his view may be shut out at the pleasure of the owner. So a man bounding on a fresh water or non-navigable stream, may have not mere privileges, but rights to the stream and in the stream, of

which he cannot be deprived, except by his consent or under the constitution; but if his boundary be on the sea or navigable waters, his rights extend only to high water mark; his privileges, as far as his senses can perceive or appreciate. What right has he beyond his boundary? All beyond belongs to the state; and although that may be slow to deprive him of any privilege, yet can it be disputed that the state would have a right to fill up in front of any riparian owner to high water mark, and erect thereon a fortification or light-house, or any other necessary object? And if no land was taken above high water, would any private property be taken for public use, any that the riparian owner must be paid for under the constitution? What is lawful for the state is lawful for its grantee, though it might seem very inexpedient and very unkind for either thus to interfere with valued privileges.

The land owner has a right to the alluvial, if its accretion be imperceptible, but if otherwise, in a body it belongs to the state, (*Angell* 149, 165) unless, when created by a sudden revulsion, it may be identified, as the case of the Goodwin estate, when it would still belong to the original owner. *Shults on Aquatic Rights* 116. And yet, in either case, the owner of the upland would be cut off from the water without remedy for his loss. Has the owner a right to fill or dock out in front of his upland, or will the sanction of time give him the right? His rights are circumscribed by his boundary, which is the high water line; any filling up or erection below that amounts to either a nuisance or a purpresture; if it interferes with the public rights of navigation and fishing it is a nuisance, which may be at once abated, or the individual causing it indicted and convicted; any building or encroachment, or intrusion, below high water, though not amounting to a nuisance, is a purpresture, which the state may demolish or seize at pleasure, or proceedings in chancery may be taken to prevent the wrong. *Angell* 199, 200. All these proceedings are based upon the idea that the land owner's rights terminate at high water; and although below that point is public property, he is just as liable for an injury done to that as if it had been private property, though the remedy may be slow and of a dif-

ferent character. No doubt, since the settlement of the state, many wharves have been built without the sanction of law, and others with it, partly from the general impression that all the property belonged to the proprietors, and partly because, in nearly every case where a dock has been constructed, the state had very little interest in the matter; the soil that was filled in being worthless, except for a dock, the state took no notice of the act. But time runs not against the state, and no length of time can sanction a nuisance or encroachment on the public (*Angell* 237) or ripen the act into a right, much less can it change the principles of the law itself. Where a man has docked out on the public without a permissive statute, he has done it at his peril, having gone beyond his own boundary; yet, in nine times out of ten, he may feel himself perfectly safe in doing so, for the reasons before adverted to ; but he cannot at any length of time turn around and claim his intrusion as an act of right, or as giving him a right. The same principle would convert the lands of the proprietors or of the United States from the true owners to be the property of any who might intrude upon them ; and, under such a rule, of what value would they be to the lawful owner ? So if we sanction a principle so at variance with the common law and the interests of the state, of what value will be the public oyster grounds or the flats in the vicinity of large cities, which, in one location only, have been estimated to be worth a half a million of dollars ? Nay, if priority of occupation by the riparian owner, though but for a day or two perchance, as in this case, by filling out, will give a title paramount to the legislative grant of the state, of what value can such grant or such property be ? If the race for title is between the tardy process by legislative grant, attainable for sixty or seventy days only in the year, and the stimulated vigilance of private enterprise, it will not be difficult to tell who will inevitably be the owner of a river flat or any portion of land covered with water, whenever it shall be likely to become valuable. I am at a loss to ascertain upon what possible principle such a claim can be founded. I know, if the state were to carry out the strict principle of the common law against all persons

who have intruded their wharves into the public waters without license, that much inconvenience and some apparent injustice would arise; but there is great difference between the state yielding up a principle that must destroy all its public rights, and enforcing that principle where it might do much private injury without any public good; besides it is no sound reason against a correct principle, that evil might grow out of its execution: it is enough to meet evil as it arises; the power of the state is ample to protect the rights, and even the wrongs of all its citizens. And if, by possibility, any evil should arise by sustaining the common law doctrine, the legislature has ample authority to grant protection. And I am not prepared to affirm that this court has not the authority to say, that although time does not run against the state, yet after a wharf has been peaceably enjoyed for twenty years or more, they will presume that a deed or license has been granted, so as to quiet titles in future. 3 *Halst.* 176; 6 *East.* 208; 1 *Am. Lead. Cases* 506. The grants for landings in the *Grants and Concessions of East and West Jersey* (*Leaming & Spicer* 25, 391) do not apply to the present question respecting rights below high water, but only to appropriations of upland " for churches, forts, wharves, keys, harbors, and for public houses."

This suit is brought by the riparian owner in the possession of the land filled up against the grantee of the state for a trespass. Had it been against any body else it might have been sustained, for the possession only is good against all the world, excepting the state and its grantee, the rightful owner, and as against his title the plaintiff, in my opinion, has failed, judgment should be rendered in favor of the defendant.

Judgment for plaintiff.

AFFIRMED, 3 *Zab.* 624.

CITED *in State* v. *Jersey City,* 1 *Dutch.* 528; *O'Neil* v. *Annett,* 3 *Dutch.* 293; *Cobb* v. *Davenport,* 3 *Vr.* 380; *Stevens* v. *Pat. & Newark R. R. Co.,* 5 *Vr.* 537; *Paul* v. *Hazelton,* 8 *Vr.* 107; *Nooley* v. *Campbell,* 8 *Vr.* 166: *Burnett* v. *Johnson,* 2 *McCar.* 489; *Del. & Rar. Can. and C. & A. R. R. & Tr. Co's* v. *Rar. & Del. Bay R. R. Co.,* 1 *C. E. Gr.* 367; *Keyport Steamboat Co.* v. *Farmers' Trans. Co.,* 3 *C. E. Gr.* 22; *Atty. Genl.* v. *Del. & B. B. R. R.,* 12 *C. E. Gr.* 8–10; *Atty. Genl.* v. *Del. & B. B. R. R.,* 12 *C. E. Gr.* 642.